May it please the court, I'm Alexandra Manbeck, attorney for Mr. Khu Nguyen. We're here today, Your Honor, because we believe that the administrative law judge made several reversible errors of law. The first one is his total disregard. He didn't even mention the two years of tweeting note and tweeting evaluation of the claimant's psychiatrist, Dr. Guzman, who initially fill out a form under penalty of perjury in July, in June 2015, stating that the claimant was disabled due to hallucination, psychosis. Which doctor are you referring to? The Guzman. Yes, G-U-Z-M-A-N. So he tweeted the claimant for two years, from 2014 to 2016. And the ALJ never even mentioned his name in the decision. And the defendant claimed that that was a harmless error, Your Honor. And I would respectfully submit that was a reversible error because that was a tweeting physician. There was no argument about it. He was a tweeting physician and he fill out numerous form and it was a long history of tweeting note that ended in July 2016, because we had a hearing in August of 2016. But the tweeting note, especially in 2016, mentioned that the claimant had continuous auditory hallucination. He kept hearing buzzing noise in his ear, and that is a problem that has been present in the medical file since 2011. And so that was the first reversible error, Your Honor, that disregarded Dr. Guzman's tweeting note and tweeting evaluation. The second reversible error is the ALJ fixation on a gap of 60 that was assigned by a staff psychiatrist, Dr. Ning, in June of 2013. Dr. Ning had never tweeted the claimant. She was a staff psychologist that was employed by UPAC to fill out some of these form that was required for a benefit application. Did she see him beyond the two incidents that are recounted in the ALJ's ruling, in May and August? Did she see him on the other occasions? And she has never seen the claimant, Your Honor. She was what you call a non-examining, non-tweeting psychologist. So if you look at... Did you report the evaluations that she did in May and August were not based on in-person examination? No, Your Honor. I didn't see any sign of it. I didn't see any indication of a personal examination. It seemed that UPAC hired their staff psychologist to provide these updated notes periodically for benefit application. And also because the claimant was seeking to be dispensed from work requirement. Because when you apply for benefits, sometimes you have to do part-time work that was required by the state. So Dr. Ning had no tweeting relationship whatsoever with the plaintiff, Your Honor. And I did not find any evidence she even examined him. It seemed that she relied on the note of the tweeting doctor and the tweeting nurse. I think the tweeting doctor was Dr. Nguyen and the tweeting nurse was Elizabeth Dewart. So she relied on tweeting notes of other sources to render her opinion. But besides the fact that she assigned a gap of 60 in June 2013, but in August of 2013, she described the functional limitation of the claimant with respect to work requirement. Because she had to fill out a form that allowed the claimant not to have to fulfill the state CalWORKs requirement. And she described much more severe limitation in terms of social functioning, in terms of concentration, persistence, and pace because she... Didn't she say in her notes that he appeared alert and coherent and well-groomed and spoke clearly? Wouldn't that come from a personal observation? Yes, Your Honor. You might look all right. You look physically fine. You can maintain a conversation. So I thought you said, I'm sorry. I thought you said Nguyen never treated him. No, she never treated him, Your Honor. The tweeting notes show that she... But did she examine him? I'm not even sure of that. It seemed that she might have examined him once in June of 2013 when she filled out the form, but not so... I thought it was May, but okay. Right. So I wasn't sure because I was looking through her note and it seemed that she was relying on tweeting note of Dr. Nguyen and the registered nurse, Elizabeth Duart. In any case, she never... She could do both though, right? She could rely both on previous notes and her own observations. That would be permissible. Right. She could rely on, but the defendant keep referring her, Your Honor, as a tweeting source and she has never treated the claimant. When we mentioned the regulation in term of defining a tweeting source is a source who saw the claimant several times per year and prescribed medication and follow up on the treatment. So this person, Dr. Nguyen, never tweeted the claimant. But in any case, Your Honor, that's the second reversible error. And the third one deal with the testimony of an expert witness, Dr. Simon, who testified that the claimant has marked limitation in social functioning and that the ALJ just dismissed it because he say it doesn't conform. That testimony does not conform to the record, but he could say it does not conform to the record because he dismissed... He never considered Dr. Guzman's treatment for two years. And to bring to your attention, Your Honor, Dr. Simon never even saw Dr. Guzman's tweeting notes that say that the claimant has severe hallucinations, severe psychosis. Are you contending that he meets the requirements of one of the listings or just that the residual functional capacity was improperly assessed? Well, you can argue both, Your Honor, because at worst, the claimant would meet the listing based on Dr. Simon's... Did you argue in your opening brief that he met one of the listings? I mentioned that at the minimum, the residual functional capacity is a lot less than the ability to do full-time medium work, Your Honor. So I did not argue that it would meet the listing. But if Dr. Simon, the benefit of the doubt from what he testified, and he also testified that the claimant has possibly Parkinson's disease transcripts 75, 76, based on his behavior, based on his conduct. So if we give Dr. Simon full credibility, then I would submit, Your Honor, that the claimant would meet the listing. And the final reversible error is the AFL refusal to give full credibility to the claimant's son and daughter testimony. He relied on a 2011 testimony of the son, but 2013, 2016, the children testified that the father no longer drive and was no longer able to take them anywhere. So your time has expired. I'll let you go over. I'll actually give you a minute in the follow-up, but I think we should hear from the other side. All right. So this is fear. You may proceed. Good morning, Your Honor. Elizabeth Spear for Andrew Stahl, the Commissioner of Social Security. I would like to address the nature of Dr. Ning's treatment. First, she saw a claimant at UPAC and there are plenty of records in the, in there are plenty of reports from UPAC in the record. It exhibits 1F, 2F, 5F, 9F, and 10F. I only saw indications that that she submitted two reports and maybe that she met him on two occasions. And those are the only two referenced in the ALJ's ruling, August 1st, May 14, 2013. But then the ALJ says that Dr. Ning has had the opportunity to treat the claimant over time and then rejects others who met him for only short periods of time on the grounds that hers was longer. I don't see where that is supported in the record. Explain that to me. Well, if you look at, at exhibit 1F, you can see that, that Dr. Ning actually had treated the claimant because she makes observations that someone could only see if they were, if they were addressing the person, the claimant person. Can I follow up on that? Because I'm, I'm not sure. So I know I asked that question, but that would just be consistent with evaluating the claimant. What statement did she make that is consistent with actually treating over time, which is what the ALJ said. And here at most, I thought she met with the claimant once or twice. I'm not even sure how you treat someone if you meet with them only once or twice. Well, well, your honor, I didn't get to this in my initial opening statement, but because Dr. Ning was treating the claimant through UPASS, which has, which has a very long history with the claimant. There, there is case law that says you can attribute like, because it's a group treatment situation. So, so we can say that Dr. Ning does understand claimant treatment overall. And, and I would agree with you that probably the ALJ could have used other doctors who treated claimant at UPASS to better affect in the decision. No indication in ALJ's ruling that he was relying on that kind of vicarious attribution to Dr. Ning. He just seemed to misunderstand her relationship to him. Well, I wouldn't, I wouldn't agree with that, your honor, because I think that, that Dr. Ning did see claimant in the, in a, like the earlier part of his current set of treatment with UPASS, he had treated with them back in 2001, and then stopped for a while and came back starting in 2011. Dr. Ning issued her statement in 2013. And then, and it's, even if you would find that the ALJ erred and should not have said she treated him on multiple occasions, her clinic treated him on multiple occasions, and that follows through the record. And I would direct your attention to Exhibit 27F, which is the latest evidence from UPASS, and that is in 2016. And that is Dr. Guzman, which brings me to another point that my opponent made that the ALJ improperly ignored Dr. Guzman's opinion because of the Department of Homeland Security form that he filled out. But if you look at Dr. Guzman's records at 27F, they are very consistent with what Dr. Ning said in the beginning, that claimant's limitations are relatively moderate, and that if you look at mental status examinations in 27F, they are very, very benign. I'm sorry to interrupt, counsel. Can I ask about that? Because Guzman, right, your friend on the other side claims Guzman was a treating physician, and that the ALJ didn't even discuss Guzman. And Guzman did meet, at least with the claimant, more than Ning, it seems, and that seems true from their records, did several evaluations from 2014 to 2016. Why did the ALJ, at the very least, have an obligation to explain why Guzman was not considered a treating physician, especially under your vicarious liability theory, because Guzman was also at UPAC? Well, I think that the ALJ addresses UPAC in general, and I agree with you, he could have been a little more clear about which sources he was talking about at particular times, but it is permissible for the agency to consider treatment at a particular clinic in total, and that's what the ALJ did here. And again, if you look at what the actual treatment records from UPAC say, and 27F is a particularly good one, but you also have 5F, and they do not document anywhere near the extreme allegations that claimant is making, that he's incapable of leaving the house, that he can't follow simple directions. These reports are very benign for the most part, and it is true that claimant has this schizoaffective disorder, but he has been treating monthly with Haldol for many years, and it is effective, and I think the Dr. Simmons testimony really wraps up the evidence very well. He talks about the trajectory of the claimant's impairment. He had these schizoaffective conditions, and he was having a hard time keeping up with his medications when they were oral, so when UPAC decided to give him monthly injections, they couldn't forget, he stabilized, and I think the MD's testimony is very detailed, and it goes really into the weeds of the treatment record, and the ALJ gave a lot of weight to Dr. Simmons' testimony, so I think you're right that the ALJ could have identified specific doctors at UPAC a little better, but I don't think it's possible to say that UPAC wasn't a treating clinic overall, and that if you look at what's actually in the record from that clinic, they do support that claimant can work with some limitations that account for his moderate limitations in social functioning, and speaking to that, my opponent insisted that you address this treatment of Dr. Henderson. Can you address the ALJ's treatment of Dr. Henderson? Dr. Henderson, the ALJ gave it partial weight, and he read it as saying that the claimant has moderate limitations in the social functioning and some moderate limitations in following simple instructions, and then that's 620 in the record, and Dr. Simmons speaks to that as well, and I would like to point, and what I'm about to say is not in our brief, but it is a matter of public record, that Dr. Henderson had to surrender his medical license in August 2017 for reasons that are relevant to this case, because he had to surrender his license for six counts. First one was gross negligence. One of the other ones was failure to keep accurate and complete records, and another one was administering medications and treatment without proper medical examination, so I can give you a case number for that if you'd like to know it, but so I would take what Dr. Henderson says with a grain of salt here. What you just said is not in the record. Can we record? You can't argue something that's in the public record that you didn't think important, and that's put in your brief. Isn't the court allowed to take notice of something that's public record? That would be our position, but if you would like me to submit it as a 28-J letter, I'd be happy to do that, but back to what the ALJ did with Dr. Henderson's opinion. The ALJ gave it partial weight and read it as indicative of moderate limitations in the social functioning and the ability to perform simple repetitive work, and Dr. Simmons, who reviewed the record, said the same thing. At page 72, he clearly says Clayman has the ability to work with no public contact, and he also addresses Dr. Henderson's report. He addresses the other one-off examinations from Drs. Lesner and Dr. Miller and refutes them for very good reasons. In particular, Dr. Miller, who decides that the Clayman is mentally retarded at this later stage in his life, and Dr. Simmons gives a very good explanation for why that's not the case, why that doesn't make any sense, and he points out that Dr. Lesner's opinion is based largely on plaintiff's subjective allegations and testing that is very subjective, and the rest of the record just doesn't support the extreme limitations in any of those opinions, and substantial evidence requires the court to review the ALJ's decision as a whole based on the record as a whole, and if it's based on all standards, it should uphold the decision, and that's what we ask you to do. Thank you, counsel. I'll give this matter, I'll give you one minute. Your Honor, I would like to bring to your attention the fact that Dr. Simon never saw Dr. Guzman's report or tweeting note for two years, 2014 to 2016, so if had Dr. Simon been given that report, he would have found the Clayman to be beating the listing, but in any case, even without that report, Dr. Simon had testified that the Clayman may have Parkinson's disease based on his activity because it says, we know this man does not go out very much and stay on his couch, and so maybe he has this Parkinsonian, but those are the side effects, so I submit, that Dr. Simon's full testimony should be taken into account, and the ALJ's partial adaptation of Dr. Simon is reversible error. Your Honor. Thank you, counsel. Time has expired. The case just argued will be submitted. Thank you. Thank you, Your Honor. All right, and we'll take a five-minute recess and resume with the last two cases.
judges: Bea, Thapar, Collins